UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

─────────────────────────────────────────────

LENGEORGE BURNS,

           Plaintiff,

      v.                                                      Case No. 22-cv-0572-bhl

NATHAN TAPIO, et al.,

           Defendant.

─────────────────────────────────────────────

## DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

─────────────────────────────────────────────

      Plaintiff Lengeorge Burns, an inmate at the Waupun Correctional Institution, is representing himself in this 42 U.S.C. §1983 action. He is proceeding on Eighth Amendment claims based on allegations that Defendants Nathan Tapio and Mary Moore delayed treatment for his wrist/hand, interfering with specialists' ability to diagnose and relieve his wrist/hand pain. He also is proceeding on a claim that they were deliberately indifferent to his pain while he waited for treatment. Finally, Burns is proceeding on a deliberate indifference claim against Defendant Robert Weinman based on allegations that he ignored Burns' complaints that he was not receiving adequate care from Moore. On April 24, 2023, Defendants moved for summary judgment. For the reasons explained below, the Court will grant their motion and dismiss this case.

## BACKGROUND

      At the relevant time, Burns was incarcerated at Waupun, where Tapio worked as a nurse practitioner, Moore worked as an advanced practice nurse prescriber (APNP), and Weinman worked as the health services manager. On August 10, 2017, Burns was seen by a nurse for complaints of hand pain. Burns received acetaminophen, a rubber band for hand exercises, daily

ice packs, an ace wrap, and a brace. A couple of weeks later, on August 24, 2017, he was again examined by a nurse who noted a minor lump in his palm. She checked the box on her report requesting that a provider review his chart to determine whether an x-ray was needed. That same day, Tapio ordered an x-ray. Burns hand was x-rayed a few days later, on August 28, 2017; the results were normal and showed no fractures or abnormalities. Dkt. Nos. 25 and 37 at ¶¶1-4; 27-31.

Nearly two months later, on October 18, 2017, Tapio examined Burns for complaints of headaches and hand pain. For Burns' hand pain, Tapio ordered a wrist brace, placed an order for Lidocaine 4% topical cream, and scheduled a follow-up appointment for eight weeks. Burns also continued to receive acetaminophen during this time. Unfortunately, the wrist brace was not issued to Burns until January 10, 2018, but Tapio asserts that he was not aware of or involved with the delay in issuing the brace. Tapio explains that once he places an order, others in the health services unit implement the order. After Burns received the brace, Tapio extended his order for three months. Dkt. Nos. 25 and 37 at ¶¶32-37.

Tapio next examined Burns on February 14, 2018. Burns complained of chronic joint pain, chronic left knee pain, left wrist/hand pain, and headaches. Tapio placed an order for Burns to see an offsite orthopedic specialist for his knee and wrist/hand pain. He also ordered a physical therapy evaluation for his left hand, ice as needed, a topical pain gel, an electromyography (EMG), and a follow-up appointment in three weeks. Two months later, on April 13, 2018, Tapio placed an order for a topical pain gel, lidocaine cream, and gabapentin for Burns' occipital neuralgia and headaches. Tapio asserts that he did not provide any further care to Burns prior to November 6, 2018, when he ceased being employed at Waupun. Dkt. Nos. 25 and 37 at ¶¶38-40.

2

According to Burns' medical records, offsite orthopedist Dr. Eric Nelson (who is not a Defendant) evaluated Burns for his left-hand complaints on July 9, 2018. Dr. Nelson did not observe any trauma and noted that the x-ray was negative, but he was concerned about a possible fracture of the hook of the hamate bone, so he recommended a CT scan of Burns' left hand. Dr. Cheryl Jeanpierre (who is not a Defendant), ordered a CT scan of Burns' left hand the next day, and the CT scan was scheduled for November 7, 2018. Less than a week after Dr. Jeanpierre's order, on July 16, 2018, Burns was evaluated by offsite specialist Dr. Xian-feng Gu (who is not a Defendant) for an evaluation and EMG. Dr. Gu noted mild to moderate left carpal tunnel and mild neuropathy symptoms. Dkt. Nos. 25 and 37 at ¶¶41-42.

From Burns' medical records, it appears that Dr. Jeanpierre learned that the CT scan scheduled for November 2018 did not occur, so on December 11, 2018, she reordered the CT scan. It is not clear why, but a nurse did not complete the form required to schedule the CT scan for several additional months, until April 29, 2019. The form was then sent to the scheduler, and the CT scan was scheduled for June 5, 2019. This appointment was cancelled, although, again, it is unclear why or who cancelled it. Neither Tapio nor Moore were working at Waupun at this time. On June 21, 2019, another form was completed and sent to the scheduler. The CT scan was scheduled for July 11, 2019. Dkt. Nos. 25 and 37 at ¶¶45-50.

On July 11, 2019, Burns had a CT scan of his left hand. The CT scan showed no evidence of fracture or evidence of old fracture. In addition, "no distinct etiology for pain" was found, so the radiologist noted on his report, "Consider MRI." A couple of weeks later, on July 24, 2019, Burns was seen by APNP Robert Martin (who is not a Defendant). Burns reported that, two years prior, he had a left-hand hamate fracture that caused shooting nerve pain throughout his fingers.

Martin ordered a nerve conduction study on Burns' hand. Burns had an EMG of his left hand on September 23, 2019. Dkt. Nos. 25 and 37 at ¶¶53-55; Dkt. No. 28-1 at 83.

Moore, who started working at Waupun in July 2019, appears to have examined Burns for the first time on October 7, 2019. At that time, the results of his most recent EMG were not available. Moore noted that the first EMG showed mild to moderate carpal tunnel syndrome and mild ulnar neuropathy. She also reviewed Burns' medication history and fine-tuned his prescriptions based on his reports of effectiveness and side-effects. Finally, she instructed Burns on wrist exercises he should do hourly and ordered a larger wrist brace because Burns reported that the one he had was too small. Dkt. Nos. 25 and 37 at ¶56.

Two months later, on December 9, 2019, Burns had an appointment with Dr. Gu to follow up on the September 2019 EMG. The results were largely the same as his previous EMG—a showing of mild left carpal tunnel syndrome and ulnar neuropathy. Burns reported that weakness and numbness in his left hand were worsening and that he had pain in his left wrist. Dr. Gu recommended that Burns be seen by Dr. Nelson again (he had last seen Dr. Nelson in July 2018). Dkt. Nos. 25 and 37 at ¶59.

About a week later, on December 16, 2019, Moore cancelled Burns' gabapentin prescription, which she had prescribed two months earlier based on Burns' report that it had previously been effective in relieving his pain. According to medication logs, Burns had not missed a dose in the prior two months, yet a blood test showed no detectable level of gabapentin in his system. Given the suspected misuse, Moore cancelled the prescription and informed Burns that they could talk about an alternative medication. At the time, Burns also had lidocaine topical and acetaminophen for pain. Dkt. Nos. 25 and 37 at ¶¶61-62.

About four months later, at Burns' request, Moore examined him and placed an order for Burns to see a neurologist for his headaches. A little more than a month after that, on June 11, 2020, Burns asked to be seen in his cell. He noted that he was in pain and stated that nothing Moore was doing was helping. He was specifically concerned about his gout and stomach pain. Moore saw Burns in his cell and ordered a foot basin and Epson salt, renewed the order for ice, and noted that orthopedic and neurology appointments were scheduled, as were a CT scan of his head and an eye appointment. About a week later, on June 19, 2020, after further review of Burns' records, Moore increased his propranolol dose to help with his headaches. She again confirmed that he had an orthopedic appointment scheduled for his carpal tunnel syndrome. Burns asked Moore to "stop with the medications." He apparently believed Moore was not doing enough to figure out the cause of his problems and was instead (mis)focused on prescribing new medication or claiming he was abusing his medication. Dkt. Nos. 25 and 37 at ¶¶65-72.

On June 26, 2020, Burns' offsite orthopedic appointment was cancelled because of the COVID lockdown. Burns had a telemed visit with Dr. Gu's physician assistant on July 10, 2020. He asserted that Burns should follow up with Dr. Nelson (the orthopedist) as Dr. Gu had recommended in December. Burns was seen by an APNP in orthopedics at Waupun Memorial Hospital on September 22, 2020 for evaluation and treatment of his knee and hand pain. The APNP noted that she did not see that Burns had received a CT scan as had been previously recommended. She noted that a fracture involving the hook of the hamate would not heal, so she ordered another CT scan of Burns' left hand to confirm her suspicion that he had such a fracture. About three months later, on December 16, 2020, Burns had a CT scan of his left hand, the results of which were the same as his first CT scan, *i.e.*, no acute fracture or dislocation and unremarkable soft tissue. Dkt. Nos. 25 and 37 at ¶¶73-79; Dkt. No. 28-1 at 66.

On June 10, 2021, Burns had another EMG, followed by an evaluation by Dr. Gu, who reported that the EMG study showed 1) mild left ulnar neuropathy at wrist level which, compared to the EMG study in 2019, showed a slight progression and 2) mild left median sensory neuropathy which was new compared to the EMG study in 2019. During the following months, Burns wrote to health services complaining that he was still in pain. Moore responded to his complaints, detailing his treatments, medications, diagnostic tests, and evaluations. She also adjusted his pain medication, increasing his dosage of Celebrex. On August 19, 2021, Moore placed an order for Burns to be seen by the orthopedist, who had a telemed visit with Burns on August 30, 2021. Dr. Nelson reviewed the many diagnostic tests Burns had received and discussed treatment options with him. Burns stated that he wanted to proceed with a carpal tunnel release surgery. Burns was informed that, "[t]here is no guarantee of pain relief following end of healing with this procedure." Dkt. Nos. 25 and 37 at ¶¶80-97.

In mid-December 2021, after Burns complained to Weinman, Moore again reviewed Burns' medical records and consulted with Dr. Jeanpierre. In her response to Burns, Moore noted that the EMG results indicated his carpal tunnel had improved from "mild to moderate" to "mild." She explained that the reference to a "slight progression" dealt with his ulnar neuropathy, which is a different nerve than the carpal tunnel, and in any event, that too was mild. She also informed him that he was scheduled for left carpal tunnel release surgery. In January 2022, Moore ordered Burns a splint to help take pressure off the nerve. And, on March 10, 2022, Burns had carpal tunnel release surgery. Dkt. Nos. 25 and 37 at ¶¶100-105.

**LEGAL STANDARD**

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

6

Fed. R. Civ. P. 56(a). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. All reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id*. Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

## ANALYSIS

Burns acknowledges that he has a complicated medical history, including chronic headaches, occipital neuralgia, kidney disease, gout, stomach pain, and issues with his cervical spine, left knee, right foot, and left wrist/hand. But Burns clarifies that this lawsuit is not about the extensive care he has received for his many conditions; it is only about the care he received (or did not receive) for his wrist/hand pain. Specifically, Burns asserts that Tapio and Moore violated his constitutional rights when they delayed ordering necessary diagnostic tests and failed to follow the recommendations of offsite specialists, thereby delaying his carpal tunnel release surgery and unnecessarily prolonging his pain. Burns also asserts that Weinman, as the health services manager, violated his constitutional rights when he ignored Burns' many complaints about the breakdown in his and Moore's relationship.

7

To prevail on a deliberate indifference claim under the Eighth Amendment, a plaintiff must prove that prison officials intentionally disregarded a known, objectively serious medical condition that posed an excessive risk to the plaintiff's health. *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015) (citations omitted). Inmates "can establish deliberate indifference by showing that medical personnel persisted with a course of treatment they knew to be ineffective," including by failing to conduct necessary tests, ignoring specific treatment requests from the inmate, and persisting in offering weak medication in the face of repeated protests that the medication is not working. *Goodloe v. Sood*, 947 F.3d 1026, 1031 (7th Cir. 2020) (citations omitted). An "inexplicable delay in responding to an inmate's serious medical condition" can also reflect deliberate indifference. That is especially so if the delay exacerbates an inmate's medical condition or unnecessarily prolongs suffering." *Id.*

Defendants argue that, under this law, they are entitled to summary judgment. They first argue that Burns' wrist/hand pain does not qualify as an objectively serious medical condition. This argument does not carry the day, at least at summary judgment. The record shows that Defendants and others undertook extensive efforts to treat Burns' wrist/hand injury, including providing multiple forms of pain medication, diagnostic testing, and even surgery. This evidence is sufficient for a reasonable jury to find that Burns' wrist/hand pain was objectively serious. This same evidence, however, confirms Defendants' alternative argument--that their repeated efforts to treat Burns preclude a finding that they were deliberately indifferent. Indeed, given the record of Defendants' extensive actions and efforts, no jury could reasonably conclude that they violated Burns' Eighth Amendment rights.

1. **No jury could reasonably conclude that Tapio was deliberately indifferent to Burns' wrist/hand pain.**

Burns was under Tapio's care for complaints of wrist/hand pain for just over a year, starting in August 2017 and continuing through November 6, 2018, when Tapio left Waupun to work at a different institution. The day Tapio first became aware of Burns' complaints via a nursing record, he ordered an x-ray, which was completed within a week and showed no abnormalities. When Burns' complaints of pain continued, Tapio ordered a wrist brace, topical pain ointment, and continued Burns' prescription for acetaminophen. Burns did not immediately receive the brace, but Tapio was not responsible for the delay. Tapio explains that once he places an order, others in the health services unit are responsible for fulfilling the order. Burns' complaints of pain continued, so on February 14, 2018, Tapio placed an order for Burns to see an offsite orthopedist. He also ordered physical therapy, ice, topical pain gel, and an EMG.

The orthopedist and EMG appointments did not occur until July 2018, but, again, Tapio was not responsible for the delay. The record confirms that advanced care providers do not schedule offsite appointments. Dkt. No. 25 at ¶22. And the health services unit has limited control over scheduling as the appointments are scheduled according to the offsite provider's availability along with the institution's transportation availability. *Id.* at ¶23. Tapio explains that staff have no control over the calendars of offsite providers, so they must take whatever available appointments are offered. *Id.* at ¶24. Burns' complaints of pain continued while he waited for the appointments, so Tapio placed an order for a topical pain gel, lidocaine cream, and gabapentin.

The orthopedist recommended a CT scan to assess whether Burns had a fracture in his hand. Burns makes much of the fact that Tapio did not order the CT scan, but he ignores the fact that another provider placed the order the day after it was recommended, so there was no need for

Tapio to also place an order. The CT scan was originally scheduled for the day after Tapio stopped working at Waupun.

On this record, no jury could reasonably conclude that Tapio was deliberately indifferent to Burns' hand pain. Tapio began with conservative measures such as a brace and topical ointments, and when those did not address Burns' complaints, he tried new interventions such as ice and other pain medications. When it was clear he was unable to diagnose the source of Burns' pain, he referred Burns to specialists for further assessments. While there was some delay in Burns treatment, the record shows that Tapio was not responsible for the delays and therefore cannot be liable. *See, e.g., Resel v Fox*, 26 F. App'x 572, 576 (7th Cir. 2001) (holding that a person who is not personally responsible for a delay is not accountable for the conduct of his coworkers and/or subordinates).

Burns highlights that after he met with the specialists, Tapio never discussed their findings with him, which violated Department policies. But §1983 "protects plaintiffs from constitutional violations, not violations of state laws or, in this case, departmental regulations . . . ." *Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003). Even if Burns' allegation is correct, it is far from clear how Burns would have been harmed by Tapio's failure to summarize appointments that Burns himself attended. In any event, the only substantive recommendation from the specialists was that Burns have a CT scan, and as noted, a provider ordered the CT scan the day after it was recommended. In short, given the totality of the care that Tapio provided to Burns, no jury could reasonably conclude that he was deliberately indifferent to Burns' wrist/hand pain. Tapio is therefore entitled to summary judgment.

### 2. No jury could reasonably conclude that Moore was deliberately indifferent to Burns' wrist/hand pain.

Moore began working at Waupun in July 2019. She first examined Burns three months later, in October 2019. By that time, Burns had already been evaluated by an offsite orthopedist and had two EMGs and a CT scan, which showed no evidence of a current or prior fracture and "no distinct etiology for pain." Although the radiologist suggested an MRI on his report, neither of the specialists recommended one. In any event, the CT scan had occurred several months *before* Moore began caring for Burns. Burns continued to complain of pain, so Moore adjusted his medications based on his reports of effectiveness and side effects. She also instructed him on wrist exercises and ordered a larger brace for him. In December 2019, the specialist who performed the EMG recommended that Burns see the orthopedist again. Burns highlights that, despite this recommendation, he did not see the orthopedist until twenty months later, in August 2021. But Burns ignores Moore's multiple efforts to address his condition during that time. Burns also fails to acknowledge that the reasons for the delay were outside of Moore's control.

Admittedly, it is not clear who placed the order or when the order was placed for Burns to see the orthopedist, but Moore informed Burns twice in June 2020 that an appointment with the orthopedist was scheduled. Unfortunately, that appointment was cancelled on June 26, 2020 because of an institution lockdown in response to COVID. Moore does not bear responsibility for that cancellation. Burns then had a telemed visit with the assistant of the specialist who performed the EMG in July 2020. Burns highlights that the assistant suggested Burns be examined by the orthopedist as had already been recommended, but he ignores that this appointment occurred *after* Burns' appointment with the orthopedist should have happened. Again, Moore was not responsible for the cancellation of Burns' appointment with the orthopedist.

About two months later, in September 2020, Burns had an appointment with an APNP in orthopedics. The APNP observed that the orthopedist had previously asked for a CT scan of Burns' hand, but she did not see that one had already occurred. *See* Dkt. No. 28-1 at 64. The APNP was wrong; Burns had a CT scan in July 2019. *Id.* at 83. According to Burns, the APNP placed the order for another CT scan herself, and he received the CT scan in December 2020. Moore is not responsible for the delay caused by the APNP overlooking the July 2019 CT scan. And, in any event, as was the case with the first CT scan, the December 2020 CT scan showed no fracture, and the soft tissue was unremarkable.

Burns asserts that, once a fracture was ruled out, Moore should have immediately pursued scheduling a carpel tunnel release surgery, as this was the next step recommended by the APNP. But Burns mischaracterizes the APNP's report. The APNP suspected that Burns had a fracture. She stated that if her suspicion was confirmed by the CT scan, Burns should be referred to a hand surgeon. She noted that she and Burns had also discussed a carpal tunnel release and that she had given Burns an informational handout for him to review in the event the CT scan showed no fracture. The APNP did *not* recommend a carpal tunnel release in the event no fracture was detected. *See* Dkt. No. 28-1 at 66. Moore cannot have been deliberately indifferent for delaying a surgery that had not yet been recommended.

Moore had no responsibility for when appointments with specialists were scheduled, whether appointments were cancelled, or others' errors in reviewing Burns' records, but the record confirms she continued her efforts to address Burns' pain. She maintained his prescription for pain gel and acetaminophen, adjusted his medications based on his reports of effectiveness and side-effects, and referred him for yet another EMG to assess the source of his pain and whether his condition was changing.

12

In August 2021, Moore placed an order for Burns to see the orthopedist, who was able to examine Burns later that month via a telemed visit. The orthopedist observed that "the CT scan was negative for any evidence of fracture involving the hook of the hamate, and frankly any other significant orthopedic pathology as well." Dkt. No. 28-1 at 53. The orthopedist discussed with Burns the option of a carpal tunnel release surgery, but he did not recommend that one be performed or opine that such a surgery was necessary to relieve Burns' pain. In fact, he cautioned Burns that "[t]here is no guarantee of pain relief following end of healing with this procedure." *Id.* Burns opted to pursue the surgery, which after institution approval took place on March 10, 2022.

No jury could conclude from this chronology that Moore deliberately delayed Burns' treatment, ignored specialists' recommendations, or ignored his complaints of pain. The delay Burns experienced in scheduling appointments with specialists and diagnostic tests may have been frustrating to him, but he offers no evidence from which a jury could conclude that Moore was responsible for those delays. As noted, advanced care providers are not responsible for scheduling appointments, and they have no control over the schedules of the institution or the offsite providers. The evidence shows that Moore and others repeatedly placed orders for appointments with specialists, diagnostic tests, and ultimately surgery. Moore is not liable simply because those orders were not immediately implemented by others or because Burns preferred a faster resolution.

With regard to addressing Burns' complaints of pain, the record shows that Moore continually adjusted his medications and repeatedly offered other support such as braces and exercises. Burns highlights that Moore denied his request for ice, which he says was one of the few treatments that helped relieve his pain. But, while there is a dispute regarding why Moore refused to give Burns ice, that dispute is not material. Burns would have preferred ice, but prisoners are not entitled to their preferred treatment, only to adequate care. *See Johnson v.*

13

*Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006). Moore refused to provide Burns with ice, but she instructed him to use cold and warm washcloth compresses instead. Also, as the Seventh Circuit has long instructed, when considering whether a provider's care evidences deliberate indifference, the Court must look at the totality of an inmate's medical care; isolated instances of neglect will not support a finding of deliberate indifference. *Gutierrez v. Peters*, 111 F.3d 1364, 1375 (7th Cir. 1997). Given the frequent care and attention Burns received from Moore, including medications, referrals to specialists, diagnostic tests, physical therapy, and medical devices, no jury could reasonably conclude that Moore was deliberately indifferent to Burns' wrist/hand pain, so she is entitled to summary judgment.

3. **No jury could reasonably conclude that Weinman was deliberately indifferent to Burns' complaints about Moore's treatment.**

Burns asserts that Weinman violated his rights because he failed to address his many letters complaining about the breakdown in his relationship with Moore. Prison administrators can rely on medical personnel unless they have "reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *Stewart v. Wexford Health Sources, Inc.*, 14 4th 757, 767 (7th Cir. 2021) (citations omitted). Burns has provided no evidence that Weinman turned a blind eye to mistreatment. Weinman responded to Burns' letters or forwarded them to others to respond. And, as explained above, no jury could reasonably conclude that Moore was deliberately indifferent to Burns' wrist/hand pain. Given that the record shows that Moore provided constitutionally adequate care, Weinman cannot be liable for failing to intervene in her care. He also is entitled to summary judgment.

14

## CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants' summary judgment motion (Dkt. No. 24) is **GRANTED** and this action is **DISMISSED**. The Clerk of Court will enter judgment accordingly.

Dated at Milwaukee, Wisconsin on November 14, 2023.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge

---

This order and the judgment to follow are final. Plaintiff may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **30 days** of the entry of judgment. *See* Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). If Plaintiff appeals, he will be liable for the $505.00 appellate filing fee regardless of the appeal's outcome. If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* with this Court. *See* Fed. R. App. P. 24(a)(1). Plaintiff may be assessed another "strike" by the Court of Appeals if his appeal is found to be non-meritorious. *See* 28 U.S.C. §1915(g). If Plaintiff accumulates three strikes, he will not be able to file an action in federal court (except as a petition for habeas corpus relief) without prepaying the filing fee unless he demonstrates that he is in imminent danger of serous physical injury. *Id.*

Under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of judgment. The Court cannot extend these deadlines. *See* Fed. R. Civ. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.